AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of: | ) | |
| | ) | |
| White Samsung Galaxy; Seizure No. 2025250600050801-0004 ("Target Device 2") | ) ) ) | Case No.    25MJ5776 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2, which is hereby incorporated by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841, 843, 846, 952, 960, 963 | Importation and distribution of federally controlled substances and conspiracy to commit the same; illegal use of communication facility. |
| 18 U.S.C. 1956, 1957 | Money laundering and conspiracy to commit the same. |

The application is based on these facts:

See attached Affidavit of Dillon J. Whigham, Special Agent, HSI, which is hereby incorporated by reference.

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days* _____ *: ) is* requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Dillon J. Whigham, Special Agent, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: October 31, 2025        _____
*Judge's Signature*

City and State: San Diego, California        Honorable Karen S. Crawford, U.S. Magistrate Judge
*Printed name and title*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **ATTACHMENT A-2**

PROPERTY TO BE SEARCHED

The following property is to be searched:

>White Samsung Galaxy

>Seizure No. 2025250600050801-0004

>(**"Target Device 2"**)

**Target Device 2** is currently in the custody of Homeland Security Investigations (HSI) at 2055 Sanyo Avenue, Suite 120, San Diego, California.

# **ATTACHMENT B**

## ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of April 1, 2025, up to and including August 13, 2025:

a. tending to indicate efforts to distribute controlled substances, import controlled substances, launder monetary instruments, smuggle bulk cash, and/or conspiracy to do the same;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of controlled substances, importation of controlled substances, laundering of monetary instruments, smuggling of bulk cash, and/or conspiracy to do the same;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution and/or importation of federally controlled substances, the laundering of monetary instruments, the smuggling of bulk cash, and/or conspiracy to do the same;

d. tending to identify travel to or presence at locations involved in the distribution and/or importation of federally controlled substances, the laundering of monetary instruments, the smuggling of bulk cash, and/or conspiracy to do the same, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved

in the distribution and/or importation of federally controlled substances, the laundering of monetary instruments, the smuggling of bulk cash, and/or conspiracy to do the same;

which are evidence of violations Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 952, 960, and/or 963; and conspiracy to money launder and money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957.

# **ATTACHMENT B**

## ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below.  The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of April 1, 2025, up to and including August 13, 2025:

a.    tending to indicate efforts to distribute controlled substances, import controlled substances, launder monetary instruments, smuggle bulk cash, and/or conspiracy to do the same;

b.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of controlled substances, importation of controlled substances, laundering of monetary instruments, smuggling of bulk cash, and/or conspiracy to do the same;

c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution and/or importation of federally controlled substances, the laundering of monetary instruments, the smuggling of bulk cash, and/or conspiracy to do the same;

d.    tending to identify travel to or presence at locations involved in the distribution and/or importation of federally controlled substances, the laundering of monetary instruments, the smuggling of bulk cash, and/or conspiracy to do the same, such as stash houses, load houses, or delivery points;

e.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

in the distribution and/or importation of federally controlled substances, the laundering of monetary instruments, the smuggling of bulk cash, and/or conspiracy to do the same;

which are evidence of violations Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 952, 960, and/or 963; and conspiracy to money launder and money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957.

**AFFIDAVIT**

I, Special Agent Dillon Whigham, being duly sworn, hereby state as follows:

**INTRODUCTION**

1.     I submit this affidavit in support of applications for warrants to search the following devices:

>    a.  Blue Apple iPhone
>
>        Seizure No. 2025250600050801-0003
>
>        ("**Target Device 1**")
>
>    b.  White Samsung Galaxy
>
>        Seizure No. 2025250600050801-0004
>
>        ("**Target Device 2**")
>
>        (collectively, "**Target Devices**")

as further described in Attachments A-1 and A-2, respectively, and to seize evidence of crimes, specifically, distribution of controlled substances[1] and conspiracy to do the same, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; unlawful use of a communication facility to facilitate the commission of drug offenses, in violation of Title 21, United States Code, Section 843(b); importation of controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 952, 960, and 963; and conspiracy to money launder and money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957 (collectively, "Target Offenses"), such evidence being more fully described in Attachment B. The **Target Devices** are currently in the custody of Homeland Security Investigations (HSI) located at 2055 Sanyo Avenue, Suite 120, San Diego, California.

2.     As described in further detail below, the **Target Devices** were seized from Veronica AVILA ("AVILA" or "Defendant") on August 12, 2025, concurrent with her arrest for importation of fentanyl, in violation of Title 21, United States Code, Sections 952

---

[1] Throughout this affidavit, I use "drugs," "narcotics," and "federally controlled substances" interchangeably.

and 960. Investigators obtained search warrants for the **Target Devices** for a limited duration of time (from July 30, 2025, up to and including August 13, 2025), timely executed the warrants, searched the **Target Devices**, and identified drug trafficking evidence. Accordingly, I am hereby submitting the search warrants specified below to extend the period of time for the search of the **Target Devices** from April 1, 2025, up to and including August 13, 2025 and extend the scope of the search to include the Target Offenses.

3.     The information contained in this affidavit is based on my own investigation and my consultations with other experienced law enforcement personnel involved in this investigation. Because this affidavit is being submitted for the limited purpose of seeking the search warrants specified below, I have not set forth each and every fact learned during the course of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrants. Any conversations and/or discussions provided below are set forth in substance unless noted. If any of these conversations and/or discussions occurred in Spanish, I have provided the English translations of those conversations and/or discussions completed by a fluent Spanish-speaking member of the investigative team. My interpretations of certain statements are set forth in parentheses or brackets and are based upon my knowledge of the investigation. Dates and times are approximate.

## BACKGROUND OF AFFIANT

4.     I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so employed since September 2024. As an HSI Special Agent, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), specifically, I am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 841(a). Prior to my tenure with HSI, I was a military police in the US Navy from approximately 2014 to 2021, during which I was a law enforcement specialist in Rota, Spain, and Honolulu, Hawaii. I was a police officer with the Pearl Harbor-Hickam ("PHP")

Police Department in Hawaii from approximately 2017 to 2021 (as military police) and from 2022 to 2024 (as a supervisory federal police officer). My last position with the PHP was as a Supervisory Police Captain. During my tenure as a military police and as a police officer at the PHP, I investigated violations of military, federal, and local law, including, but not limited to, conducting narcotics investigations and arrests, and interviewing subjects involved in narcotics trafficking. I also served as a member of the Special Response Team and as a crisis negotiator.

5.    I am currently assigned to the Contraband Smuggling division within the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

6.    As a Special Agent, I have been trained to conduct numerous investigations involving Drug Trafficking Organizations ("DTOs"). I have been trained to perform various tasks which include, but are not limited to: (a) functioning as a case agent, which entails the supervision of specific investigations involving the trafficking of drugs and the laundering of monetary instruments; (b) functioning as a surveillance agent and thereby observing and recording movements of persons trafficking drugs and those suspected of trafficking drugs; (c) interviewing witnesses, cooperating individuals, and informants relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments); (d) tracing of monies and assets gained by drug traffickers from the illegal sale of drugs (laundering of monetary instruments); and (e) participating in investigations involving the purchase of controlled substances, the execution of search warrants, surveillance in connection with narcotic investigations, and the interview of confidential sources. I have conducted interviews of drug traffickers, searches for evidence of criminal activity, surveillance operations, use of GPS precision location information, and operations involving confidential human sources.

7.    During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in money laundering, bulk cash smuggling,

and the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, money launderers, and bulk cash smugglers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry.

8.    I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to import controlled substances into and/or distribute controlled substances within the United States by concealing the controlled substances in vehicles or on persons. I am aware that narcotics traffickers frequently communicate with the individual(s) responsible for importing and/or distributing the narcotics, and/or laundering monetary instruments. These communications can occur before, during and after the narcotics are imported and/or possessed with intent the to distribute. For example, prior to the possession with intent to distribute the narcotics, traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics distribution. When the importation and/or transportation of narcotics is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. Narcotics traffickers may also communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States, and instructions concerning the laundering of monetary instruments and/or smuggling of bulk cash in support of their illicit activities.

9.    Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics distribution investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug traffickers will use social networking and messaging services on different electronic devices because it allows access to send instant

messages and communicate with other individuals in addition to the standard use of cellular phones to make telephone calls, text, web, and voice messages.

b. Drug traffickers will use social networking and messaging services because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

c. Drug traffickers and their accomplices will use social networking and messaging services features because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d. Drug traffickers will use social networking and messaging services to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e. Drug traffickers will use social networking and messaging services to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f. The use of social networking and messaging services by smugglers tends to generate evidence that is stored on the social media account, including, but not limited to chats, instant messages, photographs, contact lists, IP addresses, connected social network accounts, and location data.

10.     Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data,

remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in drug trafficking, money laundering, and bulk cash smuggling may yield evidence:

a.    tending to indicate efforts to distribute controlled substances, import controlled substances, launder monetary instruments, smuggle bulk cash, and/or conspiracy to do the same;

b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of controlled substances, importation of controlled substances, laundering of monetary instruments, smuggling of bulk cash, and/or conspiracy to do the same;

c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution and/or importation of federally controlled substances, the laundering of monetary instruments, the smuggling of bulk cash, and/or conspiracy to do the same;

d.    tending to identify travel to or presence at locations involved in the distribution and/or importation of federally controlled substances, the laundering of monetary instruments, the smuggling of bulk cash, and/or conspiracy to do the same, such as stash houses, load houses, or delivery points;

e.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the distribution and/or importation of federally controlled substances, the laundering of monetary instruments, the smuggling of bulk cash, and/or conspiracy to do the same.

## FACTS SUPPORTING PROBABLE CAUSE

**A. AVILA Knowingly Smuggled Cocaine into the United States from Mexico on August 12, 2025**

11.    On August 12, 2025, at approximately 11:25 PM, AVILA applied for entry into the United States from Mexico through the Otay Mesa (OTM) Port of Entry (POE) as

the driver, sole occupant, and registered owner of a 2014 Volkswagen Jetta ("Jetta"). A Customs and Border Protection (CBP) Canine Enforcement Team was conducting primary roving operations when the Human and Narcotics Detection Dog alerted to the passenger side dashboard of the Jetta while the Jetta was parked at the primary inspection booth. Further inspection of the Jetta resulted in the discovery of ten packages concealed in the dashboard, with a total approximate weight of 12.20 kilograms (26.89 pounds). A sample of the substance contained within the packages field tested positive for the characteristics of cocaine. CBP laboratory testing later confirmed that all ten packages contained Cocaine Hydrochloride, and had remaining net weights between 998.99 grams and 1006.19 grams.

12.    AVILA was arrested and charged with importation of cocaine, in violation of Title 21, United States Code, 952 and 960. Case No. 25-CR-3493-CAB.

13.    On September 18, 2025, AVILA pled guilty to importation of cocaine. *See* ECF Nos. 15-17. As part of her plea agreement, AVILA admitted to the following facts:

1.    On or about August 12, 2025, Defendant knowingly and intentionally drove a vehicle from Mexico into the United States through the Otay Mesa, California, Port of Entry.

2.    At the time Defendant applied for entry into the United States, concealed within the vehicle was approximately 12.20 kilograms (26.89 pounds) of cocaine, a Schedule II Controlled Substance.

3.    At the time Defendant drove the vehicle into the United States through the port of entry, Defendant knew that the vehicle contained cocaine, or some other federally controlled substance, and Defendant intentionally brought these drugs into the United States.

*See* Plea Agreement, ECF No. 15 at II(B)(1-3).

14.    AVILA is presently scheduled to be sentenced on December 12, 2025, at 9:00 a.m. *See* ECF No. 17.

**B. First Search Warrants of the Target Devices**

15.    On or about August 13, 2025, the Honorable Valerie E. Torres, United States Magistrate Judge, Southern District of California, signed search warrants authorizing the search of the **Target Devices** for importation of controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 952, 960, and 963. *See* 25-MJ-4378; 25-MJ-4379. The warrants granted authorization to search the **Target**

**Devices** beginning on July 30, 2025 (two weeks before AVILA's arrest) up to and including August 13, 2025.

16.    Between July 30, 2025 (two weeks before AVILA's arrest) and August 13, 2025 (the day of her arrest), records reflect that AVILA crossed into the United States from Mexico in the Jetta approximately 11 times.[2] Pursuant to the search warrants and subsequent search, investigators discovered numerous conversations between AVILA, using **Target Device 2**, and others which I believe, as further described below, concern the importation and distribution of narcotics, particularly around the times of her crossings. Investigators additionally discovered **Target Device 2** did not have cellular service and further analysis of historical connection data showed that **Target Device 2** had been connected by internet "hot spot" from **Target Device 1**. A "hot spot" is a feature that allows one device to share its mobile data connection to provide internet access to another through a Wi-Fi connection. Further analysis of **Target Device 1** revealed location data correlating to believed pick-up and delivery locations relayed in conversations on **Target Device 2**.

## C. AVILA Knowingly Smuggled Controlled Substances into the United States from Mexico Multiple Times in the Weeks Leading Up to Her Arrest

17.    Based on my training and experience, I believe that AVILA used **Target Device 1** for geolocation services during trafficking events (i.e. Google maps, Apple maps, etc.) and to provide cellular service for **Target Device 2**. Location data discovered on **Target Device 1** is consistent with locations sent from an unidentified co-conspirator to AVILA on **Target Device 2**.

18.    Additionally, based on my training and experience, I believe that AVILA used **Target Device 2** to discuss and coordinate drug importation and distribution via Threema[3]

---

[2] From October of 2024, up to and including the date of her arrest, AVILA was employed at FedEx, working the midnight shift as a package handler at the FedEx facility near the Otay Mesa Port of Entry, located at 10132 Airway Road, San Diego, California. FedEx timesheet records show AVILA would clock in around 2 AM and would work until around 10 AM. CBP records show that AVILA would cross the border into the US from Mexico late at night always at the Otay Mesa ("OTM") Port of Entry ("POE"), generally within a couple of hours of when she would clock-in at FedEx. During the post-Miranda interview of AVILA on August 13, 2025, AVILA said she lived in Tijuana.

[3] Threema is a paid, Swiss-based, end-to-end encrypted messaging, calling, and file transferring platform. According to Threema's website, Threema is a "HIGHLY SECURE COMMUNICATION

and WhatsApp messaging communications. These messages included, but were not limited to, location links, photos of AVILA's vehicle's relative location sent by her and then a different photo depicting the vehicle's relative location sent to her, which I believe, based on my training and experience, and the context of the conversations, were narcotics pick-up and drop-off locations.

19.    Review of **Target Device 2** revealed conversations between AVILA and an unnamed suspect ("US-1") using Threema. Meta-data showed the conversation began on April 9, 2025, and that the last communications occurred on August 12, 2025, at approximately 10:30 PM.

20.    In summary, AVILA, using the hot spot function of **Target Device 1** to provide service for **Target Device 2**, would send the details surrounding her border crossing, to include the time, how many cars were in front of her, what time she crossed, the nature of any conversation between her and the CBPO, and whether or not she was checked to US-1. AVILA would then send US-1 what appears to be an estimated time of arrival (ETA), and US-1 would respond with a specific location. AVILA would proceed to the location sent by US-1 and send a photo from the driver's seat of the vehicle depicting the vehicle's relative position. AVILA would leave the keys to the vehicle and US-1 would coordinate for someone else to come get the vehicle. Approximately an hour later, the vehicle would be returned, and US-1 would send a photo from the driver's seat of the vehicle depicting its new relative position. This pattern of behavior and messages occurred on July 30 and 31, August 1, August 6, August 7, and August 8, 2025. Representative examples of the communications between the AVILA and her co-conspirators using the **Target Devices** are included below.

### a.  July 30, 2025 Drug Trafficking Event

21.    On July 29, 2025 at approximately 11:53 PM, AVILA crossed the Jetta into the United States from Mexico and was not referred for secondary inspection. Subpoenaed records from FedEx reflect that AVILA clocked into work on July 30, 2025 at

---

– DESIGNED FOR MAXIMIM CONFIDENTIALITY." *See* https://threema.com/en (last accessed October 30, 2025).

approximately 1:46 AM and clocked out of work at approximately 9:10 AM.

22.    On July 30, 2025, at approximately 9:16 AM, AVILA messaged US-1 using **Target Device 2**, "46" [minutes] and "going" [to the narcotics drop location], and at approximately 9:48 AM, AVILA sent "10" [minutes]. At approximately 9:53 AM, US-1 replied with the location for AVILA to go to. At approximately 10:01 AM, AVILA sent US-1 a photo of the location from the driver's seat of the Jetta depicting its relative position. US-1 replied, "Ent ahí llegan" (translated: "there they come"). US-1 then sent a new location along with a partial photo of a woman, adding, "Ella te llevará pa la plaza" (translated: "she will take you to the square"). Based on my training and experience, this messaging is consistent with communications between drivers smuggling narcotics into the US and their coordinators who provide the drivers with locations to take their loaded vehicles. I believe that AVILA's messages of "46" and "10" referred to AVILA's estimated time of arrival at the narcotics drop location. This is bolstered by her co-conspirator's response "there they come" and messaging of a picture of a female, which reflects that AVILA was meeting with someone else, and the co-conspirator was directing her travel to the location to have the narcotics unloaded from her vehicle.

### b. July 31, 2025 Drug Trafficking Event

23.    On July 31, 2025, at approximately 12:33 AM, AVILA crossed the Jetta into the United States from Mexico and was not referred for secondary inspection. Subpoenaed records from FedEx reflect that AVILA clocked into work on July 31, 2025, at approximately 3:40 AM and clocked out of work at approximately 9:57 AM. Shortly after her crossing, AVILA messaged US-1 to confirm that she successfully made it into the United States in what I believe was the narcotics-laden Jetta with only a cursory inspection.[4] Indeed, it is common for narcotics smugglers, like AVILA, to keep their co-

---

[4] On July 31, 2025, at approximately 12:38 AM, AVILA messaged US-1 using **Target Device 2**, "11:30 5caros [next line] Me espere un poco [por] cambio de shift xon ellos nomas [revisaron] tronke devolada y pase alas 11:35 pase. (Translated: "I waited a little for shift change [CBP officer shift change from second shift to midnight shift]. They just checked the trunk [of the Jetta] really quick and I crossed. At 11:35[,] I crossed.").

conspirators apprised of their progress smuggling the narcotics into the United States before, during, and after the smuggling event.

24.    Additionally, consistent with her prior communications, which I believe reflected coordinated drug trafficking activity and drop offs after AVILA completed her night shift at FedEx, on July 30, 2025, AVILA also communicated with US-1 after she got off of work. Specifically, on July 31, 2025, at approximately 10:07 AM, AVILA messaged US-1 what appeared to be an ETA of "45", US-1 replied he would ask which location AVILA was to take the vehicle to, later messaging AVILA the specified shopping center. Upon arrival, AVILA messaged US-1 a photo from the driver's seat depicting the vehicle's relative position. Based on my training and experience, I believe that US-1 was coordinating the drop off of AVILA's loaded car, and AVILA was keeping US-1 apprised of her estimated time of arrival to accomplish the same. US-1 mentioned he would ask which location AVILA was to take the vehicle to. In my training and experience, this is indicative of the compartmentalization structure employed by DTOs, where the load drivers, who have the highest likelihood of being caught by law enforcement, must communicate with a coordinator rather than each other.

### c.    August 1, 2025 Drug Trafficking Event

25.    On August 1, 2025, at approximately 12:08 AM, AVILA crossed the Jetta into the United States from Mexico and was not referred for secondary inspection. Subpoenaed records from FedEx reflect that AVILA clocked into work on August 1, 2025, at approximately 1:20 AM and clocked out of work at approximately 9:40 AM.

26.    The day prior, on July 31, 2025, at approximately 3:26 PM, AVILA, using **Target Device 2**, messaged US-1, "Alratio voy llegar antes fe lad 11 [PM] sin falla" (Translated: "I'll get there [to the location where the Jetta would be loaded with narcotics] before 11 [PM] without fail"), and US-1 replied he would also be there at 11 [PM]. I believe that AVILA and US-1 were coordinating AVILA's drop off of the Jetta to be loaded with narcotics prior to crossing into the United States.  Indeed, at approximately 11:40 PM, AVILA messaged US-1 that it was odd that the back doors were not open, and US-1 replied

he just drove by, and the doors were open.

27.    Approximately 50 minutes later and 20 minutes after successfully crossing into the United States, AVILA messaged US-1 at approximately 12:28 AM, "12:07 5 cars", that she crossed at 12:09, and that she was not checked. US-1 replied that it was good but asked AVILA to let him know faster. Based on my training and experience, this messaging is consistent with the loading of a vehicle with contraband before it is driven across the border and subsequent communication between the driver and the coordinator regarding the details of the driver's crossing. US-1's response for AVILA to inform him faster once she has crossed is also consistent with the oversight of DTO coordinators and the concern for interdiction and seizure of the narcotics at the border.

28.    At approximately 10:16 AM, approximately 30 minutes after getting off of work, AVILA messaged US-1 on **Target Device 2** what appeared to be an ETA of "46", US-1 replied for AVILA to go to the same location as the day before, but AVILA asked to go to another nearby shopping center, to which US-1 agreed. US-1 also instructed AVILA to never cross in her other car, only the Volkswagen. US-1 messaged, "Ya van tr aviso ahorita q este afuera" (Translated: "I'll let you know when he/she is outside"), to which AVILA replied, "Ay me avisa ay lo deje un poco atras" (Translated: Oh, let me know[.] I left it a little behind). Approximately 40 minutes later, US-1 said it was already there, and sent AVILA a photo from the driver's seat of the vehicle depicting its relative location and AVILA replied she was on the way. US-1 also messaged AVILA that the check would most likely arrive the next day. Based on my training and experience, this messaging is consistent with communications between drivers smuggling narcotics into the US and their coordinators who provide the drivers with locations to take their loaded vehicles. Upon arrival of the loaded vehicle, the driver sends a photo of its relative position and leaves the car keys. Other co-conspirators then take the vehicle to another location to unload the narcotics before returning it. The co-conspirators will often provide a photo depicting the vehicle's new relative position.

c.    **August 6, 2025 Drug Trafficking and Money Laundering Event**

29.    On August 5, 2025, at approximately 11:49 PM, AVILA crossed the Jetta into the United States from Mexico and was not referred for secondary inspection. FedEx records reflect that AVILA clocked into work on August 6, 2025, at approximately 2:04 AM and clocked out of work at approximately 9:50 AM.

30.    On August 6, 2025, at approximately 9:59 AM, AVILA messaged US-1 using **Target Device 2** that she was "out" [finished working at FedEx that day] and going to get gas, to which US-1 replied instructing AVILA which shopping center to go to; AVILA replied with what appeared to be an ETA of 43 minutes. 43 minutes later, AVILA sent a photo from the driver's seat of the vehicle in the shopping center, depicting its relative position. Approximately 43 minutes later, US-1 messaged AVILA, "Ya van de regreso" (translated: "they're headed back now") and sent a photo from the driver's seat of the vehicle depicting its new relative location in the shopping center parking lot. US-1 sent AVILA a new address in Tijuana, informing AVILA that there she would see "el tio" (translated: "Uncle"). AVILA informed US-1 when she arrived at the address in Tijuana and US-1 replied that "Tio" was coming. Subsequent messages discuss AVILA's payment and when/how US-1 would pay her. Based on my training and experience, I believe that AVILA delivered narcotics and engaged in money laundering of narcotics proceeds and/or bulk cash smuggling on August 6, 2025. Specifically, sending a driver to a location in Mexico after delivering narcotics in the United States is a tactic commonly employed by DTOs to (1) facilitate the smuggling of bulk cash proceeds from narcotics sales back to Mexico and (2) pay the driver. This method allows traffickers to consolidate illicit profits while evading detection by law enforcement. By directing drivers to return to Mexico, organizations leverage established routes and concealment methods to transport large sums of currency, which are often used to fund further criminal activities or launder money within the financial systems of Mexico and other countries.

### d. August 7, 2025 Drug Trafficking Event

31.    On August 6, 2025, at approximately 11:56 PM, AVILA crossed the Jetta into

the United States from Mexico and was not referred for secondary inspection. FedEx records reflect that AVILA clocked into work on August 7, 2025, at approximately 2:07 AM and clocked out of work at approximately 9:28 AM.

32.    The night prior, on August 6, 2025, at approximately 10:59 PM, AVILA messaged US-1 using **Target Device 2** asking where to go. US-1 replied with a location in Tijuana and AVILA provided her ETA of 11:16.

33.    On August 7, 2025, at approximately 12:07, AVILA messaged US-1 in the same format as previous messages at the same time with how many cars were in line ahead of her and that she crossed at 12:01 without being checked. FedEx records show AVILA clocked in at approximately 2:07 AM and clocked out at approximately 9:28 AM.  At approximately 9:49 AM, AVILA sent what appeared to be her ETA and US-1 responded with which shopping center to go to. Upon arrival, AVILA sent a photo from the driver's seat depicting the vehicle's relative location, and approximately an hour later, US-1 sent a photo from the driver's seat depicting the vehicle's new relative location. US-1 then told AVILA to let him know when she was 15 minutes away from the address in Tijuana, advising AVILA who had her payment. US-1 told AVILA someone was coming with her payment and that, "Te dará 6 mil lo demás pa más tardar el domingo queda" (translated: "He will give you 6 thousand [dollars for payment of her drug trafficking activities], the rest by Sunday at the latest").

34.    As noted above, the investigating agents previously searched data on the **Target Devices** for the period of July 30, 2025, up to and including August 13, 2025, for items that constitute, evidence, fruits, and instrumentalities of violations of importing controlled substances and conspiracy to do the same. During that review, the investigating agents identified the aforementioned messages between AVILA and US-1 that appeared to coordinate the importation of drugs from Mexico into the United States, and the transportation of drugs within the United States and smuggling of bulk cash or money laundering. Bolstering this belief, CBP records reflect that AVILA crossed into the US from Mexico using the Otay Mesa Port of Entry on dates and times that correspond to the

messages she sent to US-1 with the details of her crossing.

**D. Additional evidence of violations of the Target Offenses will be found on the Target Devices**

35.    Based upon my training and experience, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**.  In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the **Target Devices** to communicate with others to further the importation of controlled substances into the United States, and to transport the controlled substances to destinations in the United States and transport bulk cash outside of the United States.  Further, in my training and experience, drug traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Further, review of the metadata from **Target Device 2** revealed that AVILA's Threema conversations with US-1 began on April 9, 2025. Additionally, co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics.

36.    Based upon my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on April 1, 2025 (approximately 8 days prior to her starting to use Threema, which is the encrypted platform AVILA used to speak with her drug trafficking coordinator US-1), up to and including August 13, 2025.

## **METHODOLOGY**

37.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is

subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

38.     Following the issuance of this warrant, I will collect the **Target Devices** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

39.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## **CONCLUSION**

40.    Based on the facts and information set forth above, I submit there is probable cause to believe evidence of violations of the Target Offenses will be located within the **Target Devices**, as described in Attachments A-1 and A-2. Accordingly, I seek authorization to search the **Target Devices** for evidence of the Target Offenses, as described in Attachment B.

_____
Dillon Whigham
Special Agent, HSI

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 31st day of October 2025.

_____
HON. KAREN S. CRAWFORD
UNITED STATES MAGISTRATE JUDGE